## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 13 2017, 9:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Zahn & Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Zachary Asher,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 13, 2017

Court of Appeals Case No.
49A02-1606-CR-1311

Appeal from the Marion Superior Court

The Honorable Alicia Gooden, Judge

Trial Court Cause No.
49G21-1512-F5-45528

**Bailey, Judge.**

# Case Summary

After a bench trial, Zachary Asher ("Asher") was convicted of Carrying a Handgun without a License, as a Level 5 felony,[1] and two counts of Resisting Law Enforcement, as Class A misdemeanors.[2]  He now appeals.

We affirm.

# Issues

Asher raises three issues for our review, which we restate as:

 I. Whether the trial court properly found that Asher had waived his right to a jury trial;

 II. Whether the trial court abused its discretion in admitting evidence obtained during an investigatory stop; and

 III. Whether there was sufficient evidence to support the conviction for Carrying a Handgun without a License.

# Facts and Procedural History

On December 18, 2015, at around 1:40 a.m., Indianapolis Metropolitan Police Department ("IMPD") Officer Michael Deskins ("Officer Deskins") responded to a radio dispatch to the intersection of Tenth and LaSalle Streets in

---

[1] Ind. Code § 35-47-2-1.

[2] I.C. § 35-44.1-3-1(a)(1).

Indianapolis. An individual had called 911, identified himself, and stated that two black males wearing bandanas over their faces were at the intersection. The area of the intersection was known to Officer Deskins as a high-crime area.

[5] When Officer Deskins arrived at the intersection, he saw two youthful-looking individuals standing at the northeast corner of the intersection: a black male, later identified as Asher, wearing a black hoodie and a bandana around his neck, and a white male identified as Cody, who was wearing a white hoodie and a bandana over his face. Upon Officer Deskins's arrival, Cody removed the bandana from his face. He and Asher crossed from the north to the south side of Tenth Street, and then crossed from the east to the west side of LaSalle Street. Though the traffic signal permitted them to cross Tenth Street legally, Asher and Cody did not wait for the signal to change to permit them to cross LaSalle Street legally. Throughout this time, Asher and Cody continually looked back toward Officer Deskins's squad car and appeared nervous.

[6] After seeing Asher and Cody cross LaSalle against the traffic signal, Officer Deskins turned south and parked his car at the intersection. He then got out of the car, called out to Asher and Cody, and asked them to come over to him. The two complied.

[7] After Asher and Cody arrived at the intersection once more, Officer Deskins asked the two what they were doing in the area in the early morning hours. Asher stated that they were waiting for a ride to the area of Tenth and Highland Streets to go to Cody's home, but Cody was unable to give the specific address

of his purported residence.  When Officer Deskins asked to see Cody's identification, Cody could not produce an identification card.

[8] While Officer Deskins spoke to Cody, he observed Asher "blade" his body, placing his right hip away from Officer Deskins, and saw Asher move his hands toward his waistline.  (Tr. at 17.)  Based upon his training and experience, Officer Deskins recognized Asher's "blade" posture as one frequently used by boxers and by persons carrying weapons they wish to keep away from another individual.  Officer Deskins then asked for Asher's identification, and Asher said he did not have any with him.

[9] Officer Deskins then told Asher that he wanted to perform a pat-down search of Asher's person for weapons, and reached out and took hold of Asher's left arm.  Asher then tensed up and pulled away from Officer Deskins, yelling "You can't search me, you can't search me."  (Tr. at 18.)  Officer Deskins grabbed hold of the back of Asher's sweater, and Asher continued to struggle even after a second officer, Officer James Thalheimer ("Officer Thalheimer"), arrived at the scene to assist Officer Deskins.

[10] Asher continued to struggle with Officers Deskins and Thalheimer.  The course of the struggle took the three north across the intersection of Tenth and LaSalle Streets.  Officers Deskins and Thalheimer were eventually able to handcuff Asher, who continued to fight; Officer Deskins eventually retrieved leg shackles to subdue Asher.  Upon returning to Asher to place him in leg shackles, Officer Deskins saw an empty pistol holster that had partially slipped out of the right

rear pocket of Asher's pants.  After seeing the holster, Officer Deskins told Officer Thalheimer that there might be a gun nearby.  Looking up, both officers quickly saw a pistol lying in the middle of the intersection along the path of their struggle with Asher.

[11]    Subsequent to this, Asher was arrested.  On December 23, 2015, Asher was charged with Carrying a Handgun without a License and two counts of Resisting Law Enforcement.

[12]    On February 16, 2016, Asher filed a motion to suppress evidence obtained as a result of Officer Deskins's stop.  On March 28, 2016, a hearing was conducted on the motion.  At the conclusion of the hearing, the trial court denied Asher's motion to suppress evidence.

[13]    On April 21, 2016, a bench trial was conducted.  Shortly before the beginning of the bench trial, Asher signed a written waiver of jury trial.  The State and the trial court both agreed with Asher's waiver, and the case proceeded to trial.  At the end of the trial, the court took the matter under advisement.  On May 2, 2016, the court found Asher guilty as charged on all three counts and entered judgment against him.

[14]    A sentencing hearing was conducted on May 19, 2016.  At the end of the hearing, the court sentenced Asher to three years imprisonment for Carrying a Handgun without a License, and one year of imprisonment on each count of Resisting Law Enforcement.  The sentences were run concurrently with one

another, with one year to be served in community corrections and two years suspended to probation.

[15] This appeal ensued.

# Discussion and Decision

## Jury Trial Waiver

[16] Asher's first contention on appeal is that he did not waive his right to a jury trial, and that his conviction must therefore be reversed.

[17] "The jury trial right is a bedrock of our criminal justice system, guaranteed by both Article I, Section 13 of the Indiana Constitution and the Sixth Amendment to the United States Constitution." *Horton v. State*, 51 N.E.3d 1154, 1158 (Ind. 2016). Under Indiana constitutional jurisprudence, "in a felony prosecution, waiver is valid only if communicated *personally* by the defendant." *Id.* Personal waiver of the right to a jury trial may be either in writing or in open court. *Id.*

[18] Indiana has rejected the purported waiver of a right to a jury trial where such waiver is communicated solely by a defendant's counsel. *Id.* at 1158-59 (citing, *inter alia*, *Kellems v. State*, 849 N.E.2d 1110 (Ind. 2006); *Good v. State*, 267 Ind. 29, 366 N.E.2d 1169 (1977)). In *Horton*, the trial court inquired of Horton's defense counsel whether jury trial on one of several counts against Horton, and Horton's counsel stated an intent to proceed forward with a bench trial. *Id.* at 1156. The Indiana Supreme Court held that without Horton's personal waiver

of the jury trial right, "failure to confirm Horton's personal waiver before proceeding to bench trial was fundamental error." *Id.* at 1160. This was so even where the circumstances appeared to "imply waiver was the defendant's choice." *Id.* at 1159. Similarly, in *Kellems*, the Indiana Supreme Court held that even where Kellems had been advised of his right to a jury trial and his option to waive that right and had subsequently responded that he did not have any questions regarding his rights, counsel's communication of waiver was not enough: absent questioning of the defendant or a signed writing indicating intent to waive a jury trial, no waiver may be deemed to have occurred. *Kellems*, 849 N.E.2d at 1172-73.

[19] Asher contends that his case reflects flaws in the jury trial waiver process similar to those of *Horton* and *Kellems*. Asher draws our attention to two points of note. First, Asher observes that there was no personal, spoken colloquy between him and the trial court concerning his right to a jury trial and his intent to waive that right. Second, Asher notes that his written jury trial waiver bears a date stamp of May 20, 2016—one day after his sentencing hearing, nearly a month after his bench trial. Asher argues that the absence of personal advisement and waiver, taken together with the irregularity of the filing date of the written waiver, establishes that he did not waive his right to a jury trial, rendering his conviction constitutionally infirm and requiring reversal.

[20] A review of the record here reveals that while the filing date of the jury trial waiver is later than the date of the bench trial, the document itself appears to have been executed by Asher on the date of his bench trial. Further, the written

waiver appears to have been provided to the trial court in advance of the trial proceeding itself. Thus, while Asher insists "[t]here is nothing in this record to indicate Asher even executed the waiver because the trial court offered no inquiry regarding it" (Appellant's Br. at 17), the waiver had already been disclosed to the court. In an exchange with counsel, the trial court stated, "The Court now has a waiver of trial by jury executed by Mr. Asher and his attorney and also the State of Indiana." (Tr. at 4.)

[21] Asher suggests that the written and signed waiver is constitutionally infirm in the absence of a colloquy during which the court could obtain verbal confirmation either of Asher's intent to waive a jury trial or of the accuracy of the signature on the written waiver form—even as he acknowledges that no such colloquy is required by constitutional or statutory law. (Appellant's Br. at 15-16.) And other than the suggestion that some kind of colloquy should be required, Asher establishes no basis from which we may conclude that the signature on the waiver form is *not* his, other than the occasional use of the phrase "purportedly signed." (Appellant's Br. at 17.)

[22] Asher is no doubt correct that the procedure here could have been more regular with respect to the date on which his waiver was file stamped. That does not, however, serve to render the written and signed waiver infirm—even when taken together with the absence of a confirmatory colloquy with the trial court. We accordingly find no error in the trial court's finding that Asher had waived his right to a jury trial in this case.

# Investigatory Stop

[23]     Asher's next contention on appeal is that the trial court erred when it did not grant his motion to suppress evidence. Though Asher frames his issue as an appeal from a denial of a motion to suppress evidence, because he appeals after a trial, "the question of whether the trial court erred in denying a motion to suppress is no longer viable." *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013) (citation and quotations omitted). Asher's issue is thus more appropriately framed as whether the trial court abused its discretion when it admitted evidence at trial. *Reinhart v. State*, 930 N.E.2d 42, 45 (Ind. Ct. App. 2010).

> The general admission of evidence at trial is a matter we leave to the discretion of the trial court. We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.

*Clark*, 994 N.E.2d at 259–60 (citations omitted).

[24]     Asher identifies as an abuse of discretion the trial court's decision, over his objection, to admit into evidence a gun and a holster that were obtained as a result of Officer Deskins's investigative stop of Asher and his companion, Cody. Investigative stops implicate federal and state protections against unreasonable searches and seizures. *Id.* at 260. Generally, searches and seizures are prohibited without probable cause. *Id.* However, "[e]ncounters between law enforcement officers and public citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and

some of which do." *Id.* at 261. Nonconsensual encounters may take on the form of brief investigative stops that require reasonable suspicion to pass constitutional muster. *Id.*

[25] Reasonable suspicion to conduct a brief investigatory stop requires that the existence of "specific and articulable facts known to the officer at the time of the stop that led the officer to believe that 'criminal activity may be afoot.'" *Finger v. State*, 799 N.E.2d 528, 533-34 (Ind. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 30)). A hunch or unparticularized suspicion is not enough to satisfy the requirement of reasonable suspicion. *Id.* Rather, a police officer must be able to point to specific facts that give rise to a reasonable suspicion of criminal activity. *Id.* In assessing the existence of reasonable suspicion, we consider the totality of the circumstances and, though we review for an abuse of discretion, the determination of reasonable suspicion is one we review *de novo*. *Scott v. State*, 855 N.E.2d 1068, 1073 (Ind. Ct. App. 2003).

[26] Whether reasonable suspicion existed in a particular case is a fact-sensitive question. *Bridgewater v. State*, 793 N.E.2d 1097, 1100 (Ind. Ct. App. 2003), *trans. denied*. Presence in a high-crime area, even accompanied by flight from officers, is a factor to be looked at under the totality of the circumstances but is not sufficient in itself to give rise to reasonable suspicion for an investigative stop. *Id.* And even where there is reasonable suspicion to conduct an investigative stop, "'[a]n officer's authority to conduct a pat-down search is dependent upon the nature and extent of his particularized concern for his

safety and that of others.'" *Johnson v. State*, 38 N.E.3d 658, 662 (Ind. Ct. App. 2015) (quoting *Wilson v. State*, 745 N.E.2d 789, 792 (Ind. 2001)), *trans. denied*.

[27] Here, Officer Deskins responded to a non-anonymous tip concerning two men wearing bandanas and standing at a street corner in a high-crime area at around 1:40 a.m., when the local curfew was at 11:00 p.m. Upon arriving at the intersection of Tenth and LaSalle Streets, Officer Deskins stopped to observe Asher and Cody. Cody, whose face was covered by a bandana when Officer Deskins arrived, lowered the bandana and immediately appeared to Officer Deskins to be very young, giving Officer Deskins reason to believe that Cody was out in violation of the legal curfew. Asher and Cody began to walk away from Officer Deskins, crossing against the light as they moved west across LaSalle Street, giving Officer Deskins reason to believe that the two had committed jaywalking, an infraction.

[28] Once Officer Deskins pulled through the intersection and stopped his vehicle, he called Asher and Cody over. Asher said that the two were waiting for a ride to Cody's home, but Cody could not tell Officer Deskins their destination's address. As Officer Deskins asked Cody questions, he saw Asher "blade" his body, a posture that Officer Deskins from training and experience recognized as a fighting stance or a stance intended to keep a weapon away from another person. Asher was, like Cody, unable to provide identification when asked. When Officer Deskins attempted to perform a pat-down search, Asher immediately began to pull away and attempted to flee.

[29] Under the totality of the circumstances, it was reasonable for Officer Deskins to suspect that criminal activity was afoot. Given Asher's conduct while Officer Deskins spoke with Cody, as well as the absence of other officers present to help ensure safety, it was further reasonable under the circumstances for Officer Deskins to seek to perform a pat-down search of Asher for weapons. In light of the totality of the circumstances, we find no error on the trial court's part in denying Asher's objection to the admission of evidence obtained subsequent to Officer Deskins's investigative stop and attempt to conduct a pat-down search.

## Sufficiency of the Evidence

[30] We turn to Asher's final contention on appeal, that there was insufficient evidence to sustain his conviction for Carrying a Handgun without a License. Our standard of review in such cases is well-settled.

> This court will not reweigh the evidence or assess the credibility of witnesses. *Cox v. State*, 774 N.E.2d 1025, 1028 (Ind. Ct. App. 2002). Only the evidence most favorable to the judgment, together with all reasonable inferences that can be drawn therefrom will be considered. *Id.* If a reasonable trier of fact could have found the defendant guilty based on the probative evidence and reasonable inferences drawn therefrom, then a conviction will be affirmed. *Id.* at 1028–29.

*Sargent v. State*, 875 N.E.2d 762, 767 (Ind. Ct. App. 2007).

[31] Here, to convict Asher as charged, the State was required to prove beyond a reasonable doubt that Asher knowingly carried a handgun in a vehicle or on his

person, without being licensed as required by law, within 500 feet of a school. *See* I.C. § 35-47-2-1; App'x at 28.

[32] Asher challenges only the sufficiency of the evidence as to his possession of the handgun. His argument is that, in the absence of DNA or fingerprint evidence connecting him to the pistol, and in light of the struggle with police officers, there is insufficient evidence to connect him to the firearm that Officers Deskins and Thalheimer found in the intersection of Tenth and LaSalle Streets.

[33] At trial, Officer Deskins testified that when he arrived at the intersection of Tenth and LaSalle Streets, he did not see a gun in the intersection. Officer Deskins characterized the gun as large enough to see in the well-lit intersection, and testified that had the gun been there at his arrival, he would have seen it lying in the intersection while still in his squad car. After the struggle with Asher, both Officers Deskins and Thalheimer were able to easily and immediately see the gun, which Officer Deskins began to look for after seeing an empty holster slipping from Asher's pocket. The officers saw the gun lying in the intersection along the path of Asher's struggle with the officers, and Officer Deskins testified that the gun was not moved from that spot until it was collected by an evidence technician. Asher raises questions concerning DNA and fingerprint evidence, an argument that requests that we impermissibly reweigh evidence.

[34] There was sufficient evidence to connect Asher to the pistol. We accordingly affirm the conviction for Carrying a Handgun without a License.

# Conclusion

[35]    The trial court did not err when it found that Asher waived his right to a jury trial.  The trial court did not abuse its discretion when it admitted evidence over his objection.  There was sufficient evidence to sustain Asher's conviction for Carrying a Handgun without a License.

[36]    Affirmed.


Baker, J., and May, J., concur.